IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

U.S. HORTICULTURAL SUPPLY,    :    CIVIL ACTION
INC.,                         :
                              :
                              :
        v.                    :
                              :
THE SCOTTS COMPANY, et al.    :    NO. 04-5182

MEMORANDUM & ORDER

McLaughlin, J.                          January 13, 2009

On November 5, 2004, U.S. Horticultural Supply ("USHS")
sued The Scotts Company ("Scotts") and Griffin Greenhouse
Supplies ("Griffin") for alleged violation of Section 1 of the
Sherman Act, which prohibits contracts and conspiracies in
restraint of trade.  15 U.S.C. § 1.  USHS' theory of the
conspiracy is that Scotts and Griffin, beginning in 1998, agreed
to push USHS out of the mid-Atlantic market, and to prevent its
entry into the New England market, so as to allow Griffin to act
as the only major distributor in those areas.

USHS and Griffin reached a settlement of USHS' claims.
Scotts has filed a motion for summary judgment.  Because USHS has
failed to carry its burden of providing evidence raising a
genuine issue of material fact relevant to its claims, the Court
will grant Scotts' motion for summary judgment.

I.    Earlier Litigation Between USHS and Scotts and Current
      Procedural Posture

          In 2003, before the filing of this case, USHS sued

Scotts for attempted monopolization pursuant to Section 2 of the

Sherman Act based on the same non-renewal of a distribution

contract that is the focus of the current litigation.   The

earlier complaint also alleged two counts of promissory estoppel

and one count of breach of contract.   Scotts moved to dismiss the

Sherman Act claim and the promissory estoppel claims.   USHS

voluntarily withdrew the promissory estoppel claims, leaving only

the Sherman Act claim as the subject of its motion to dismiss.

Scotts' argued that USHS' Section 2 claim should be dismissed on

the grounds that the plaintiff lacked antitrust standing and

could not otherwise make out the elements of a Section 2

monopolization claim.   The Court denied the defendant's motion to

dismiss. U.S. Horticultural v. The Scotts Co., No. 03-773, 2004

WL 1529185 (Feb. 18, 2004).

          On February 17, 2005, under threat of Rule 11 sanctions

being filed by Scotts, USHS filed a notice of voluntary dismissal

as to the Section 2 claim.   Def.'s Letter in Opp'n, Ex. A, U.S.

Horticultural v. The Scotts Co., No. 03-773, (E.D. Pa. Feb. 22,

2005).   Scotts opposed this attempt to dismiss the Section 2

claim.   USHS had filed its notice of dismissal pursuant to Rule

11, which Scotts argued offered no mechanism for such dismissal.

Scotts then filed a motion for sanctions, claiming that USHS had

2

multiplied the number of claims against Scotts in bad faith.  The Court granted dismissal of the Section 2 claim pursuant to an agreement of the parties on February 28, 2005.  Scotts then filed a motion for summary judgment as to the remaining breach of contract claim, which the Court granted on July 20, 2005. Finally, the Court denied Scotts' motion for sanctions on June 1, 2006.

Contemporaneous with the Section 2 litigation in this Court, in the United States District Court for the Southern District of Ohio, Scotts demanded arbitration to collect a sum owed under a distribution agreement with USHS.  Arbitration was scheduled to commence on February 3, 2004, but USHS filed for bankruptcy on February 2, 2004.  The bankruptcy filing triggered an automatic stay of Scotts' claims in that arbitration, but the arbitrator proceeded to adjudicate USHS' promissory estoppel counter-claims against Scotts (the same promissory estoppel claims that USHS had withdrawn from its Section 2 suit in this Court).  USHS eventually withdrew its counter-claims and also consented to the dismissal of its bankruptcy proceedings.  With the stay lifted, Scotts moved for and received an entry of a final arbitration award.  This award was confirmed and in April of 2005 Scotts obtained a judgment against USHS for $1,842,671.11, plus interest.

On September 29, 2004, while USHS was still litigating the Section 2 claim, the Court denied the plaintiff's motion for leave to amend to add a claim under Section 1 of the Sherman Act. Following that decision, USHS filed this complaint on November 5, 2004 against Scotts and Griffin.  On June 1, 2006, the Court denied Scotts' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Following the denial of that motion, the parties proceeded to discovery and on January 31, 2008, Scotts filed the present motion for summary judgment.  At the same time, Scotts filed two Daubert motions and a motion in limine seeking to exclude post-discovery affidavits submitted by USHS.

II.   The Summary Judgment Record

A.   The Parties

The Scotts Company is a manufacturer of consumer and professional horticultural products, which sells its products through a nationwide network of distributors.  Scotts sells controlled release fertilizers ("CRF"), water soluble fertilizers ("WSF"), growing media or soil products ("Media"), plant protection products ("PPP"), aquatrols and various specialty agricultural products.  Certain of Scotts' products are sold for use in nurseries, others for use in greenhouses.  Def.'s

Statement of Undisputed Fact at 2-5 [hereinafter Def.'s St.].[1]
Of these products, CRF is at the heart of this case.  Scotts
sells approximately fifty different varieties of CRF.  Def. Ex.
27.

Griffin Greenhouse Supplies ("Griffin") has been a
distributor of Scotts' horticultural products since at least
1993.  In the mid-1990s, Griffin expanded its operations in the
eastern United States.   In 1997, Griffin had opened facilities
in Virginia and New York.  By 2000, Griffin had facilities in
Maine, Massachusetts, Connecticut, New York, New Jersey,
Pennsylvania and Virginia.  Def.'s St. at 15-16.  In September of
2002, Griffin made an offer to buy out USHS in an asset sale,
which USHS ultimately accepted.  Def.'s St. at 19-20.

USHS was a horticultural products distributor and
retailer (previously, USHS operated under the name "E.C. Geiger,
Inc.") from 1928 until it was purchased in an asset sale by
Griffin in 2002.  USHS sold Scotts' products, which accounted for
approximately 20 percent of USHS' sales revenue.  Def.'s St. at
5.  USHS has sold horticultural products nationwide and, at
times, internationally in South and Central America, Asia,
Canada, Europe and the Carribean.  Def.'s Ex. 34.  The record
contains sales documents that reflect that many of USHS' sales

---

[1]In this section of the Court's opinion, the facts discussed
are undisputed.

took place in Connecticut, Delaware, New Jersey, New York, Pennsylvania and Virginia.  Pl.'s Ex. 52.  USHS' documents compiled while preparing for its sale to Griffin list a number of the company's competitors in these states.  Def.'s Ex. 52.

Among the Scotts products that USHS sold was a line of "private label" products.  "Private labeling" consists in placing products manufactured by another company (in this case, by Scotts) in packaging bearing USHS' own label.  USHS then sells the Scotts-made product under its own brand name and using a USHS label.  At certain times throughout the Scotts-USHS relationship, and for certain products, Scotts offered a performance program related to USHS' privately labeled Scotts products.  This performance program offered USHS a rebate on Scotts' prices depending on USHS' success in selling the privately labeled products: higher volumes of sales would result in higher rebates.  An internal memorandum from Scotts describes a rise in the percentage of sales by USHS under its private label as opposed to sales under the Scotts label.  This memorandum states that in 1999 the percentage of sales of WSF under USHS' private label was 24.2% and sales under Scotts' label accounted for 75.8%; in 2001 these percentages had flipped and USHS' label accounted for 77.4% of WSF sales.  Pl.'s Ex. 86.

On May 12, 1995, USHS (at that time called "Geiger") formed a company called Geiger South.  A letter addressed to

6

Geiger South's vendors, including Scotts, and sent by the
President of USHS on May 12, 1995, stated that USHS would
"corporately guarantee all purchases by" Geiger South.  Def.'s
Ex. 36.  USHS' President Ronald Soldo testified that Geiger
South's market entry strategy relied in part on selling products
at low prices and low margins, and that this low-pricing strategy
was ultimately not successful.  Def.'s App. Dep. Tr. 16 at 170-
171, 198 [hereinafter Soldo Dep. Feb. 28, 2007].  Geiger South
went bankrupt in 1997.  At the time of Geiger South's bankruptcy,
it owed Scotts a substantial sum for products sold by Scotts on
credit; USHS covered this debt by issuing a promissory note to
Scotts in the amount of $480,000.  Pl.'s Ex. 87.

        B.    The Scotts-USHS Relationship

            In 1996, USHS and Scotts signed a Horticultural
Products Distributor Agreement.  This agreement provided that
Scotts would deliver its products to USHS' warehouses and
customers within a defined territory.  The territory defined in
the agreement included the states of North Carolina, Virginia,
West Virginia, Pennsylvania, New Jersey, Maryland, Delaware, and
Connecticut, as well as the District of Columbia, several
counties of New York and Long Island.  The territory would also
encompass Texas and Louisiana if USHS established branches in
those states.  Pl.'s Ex. 99.  The parties agree that this 1996

Agreement was drafted as part of a deal to have USHS issue a promissory note guaranteeing payment for Geiger South's debts. Def.'s St. at 11.

The 1996 Distribution Agreement expired by its terms on December 23, 2000. Scotts continued to provide USHS with Scotts products in the absence of a distributor agreement from December 23, 2000, to August 3, 2001. On August 3, 2001, USHS and Scotts agreed to renew their distributorship agreement for a term ending on September 30, 2002. This new agreement amended the definition of the territory to which Scotts would ship its products by removing the language regarding potential expansion into Texas and Louisiana. When the expiration date for this contract was reached, Scotts chose not to renew the contract. Pl.'s Exs. 99, 177; Def.'s Ex. 49.

Prior to the expiration of the 1996 Agreement, on March 19, 2002, Scotts and USHS entered into a distribution agreement that established USHS as a distributor of a CRF variety called "Ficote" (the "Ficote Agreement"). The Ficote Agreement expired by its terms on September 30, 2003. Scotts and USHS also entered into a distributor agreement on that same day establishing USHS as a distributor of another CRF variety called "Grocote" (the "Grocote Agreement"). The Grocote Agreement expired by its terms on September 30, 2006. Pl.'s Exs. 29, 101.

Throughout their relationship, Scotts offered USHS a
credit line of varying amounts.  In the time leading up to Geiger
South's bankruptcy, USHS allowed Scotts to view its financial
statements, after which Scotts reduced USHS' credit line.  After
that credit reduction, USHS refused to allow Scotts to view its
financials.  Soldo Dep. Feb. 28, 2007 at 239.  Despite USHS'
refusal to disclose its financial information, Scotts provided a
partially secured line of credit from 1998 to 2002 and beyond.
From 1998 to 2002, USHS' credit line increased from $1 million to
$3 million.  Pl.'s Opp'n at 22; Def.'s Exs. 37, 38.  A memorandum
drafted by the President of USHS in January of 2002 explained
that regularly sending checks to Scotts would maintain the
impression that payments to Scotts were among USHS' priorities.
The memorandum states that USHS had "pulled a fast one on the
Scotts bosses by getting them to go to [$3 million]."  Def.'s Ex.
41.  Following the non-renewal of the distributor agreement in
September of 2002, while the Grocote and Ficote Agreements
continued in force, Scotts provided a $350,000 line of credit to
USHS to enable the purchase of Grocote and Ficote.  Pl.'s Ex.
100.

The record contains undisputed evidence of denial of
credit to USHS by suppliers other than Scotts over the same time
period.  A series of letters between USHS and supplier X.S.
Smith, Inc., demonstrates that USHS' refusal to provide financial

information contributed to the denial of a credit line by that
supplier.  Def.'s Exs. 45, 46, 47.  The last letter in that
series, written by USHS' president and CEO, states that USHS had
"made an irrevocable decision approximately 2.5 years ago in that
it would NOT provide financial statements to any vendors."
Def.'s Ex. 47.  That letter states that despite its refusal to
provide financial information to other vendors, USHS still
benefitted from a $2 million credit line from Scotts.  Id.  USHS'
president testified that he did allow one Scotts' employee to
view USHS' financial records, but that no written records were
provided.  Pl.'s Ex. 93 at 103 [hereinafter Soldo Dep. Jan. 20,
2004].

A Scotts internal credit policy document states that
"for those companies not supplying us their financial statements:
they will be individually evaluated based on payment habits and
length of company's existence per Dun and Bradstreet and the bank
and trade references provided."  Pl.'s Ex. 150.  The record
contains several items relevant to USHS' payment history.  The
first is a Scotts document titled "Credit Limit Arbitration,"
which states in part that USHS' "payment record has been quite
consistent with a four year history."  Pl.'s Ex. 26. The
deposition of a Scotts' officer also contains testimony that USHS
was 30 days past-due on payment for certain periods of time in
2002, but that "except for the one instance . . . [the officer]

was not aware of [any] issues with [USHS] paying us as they said they would pay us on the due dates." Pl.'s Ex. 27 at 28:9-13 [hereinafter Robinson Dep.].

In contrast to the USHS-Scotts credit agreements, Griffin received a line of credit from Scotts ranging from $7.5 million to $10 million from 1999 to 2004. Def.'s Ex. 51. Griffin's owner has testified that Griffin never reached the limit of its credit line, Def.'s App. Dep. Tr. 4 at 332 [hereinafter Hyslip Dep.], although other deposition testimony states that Griffin was occasionally past-due on payments to a small extent. Pl.'s Ex. 27 at 132.

The record also contains statements by USHS officials asserting that their company's costs exceeded revenue from 1996 to 2002. The former vice-president of sales and marketing for USHS testified that his company experienced "cash flow problems" from 1997 to 2000, partially as a result of the under-performance of Geiger South. Def.'s App. Dep. Tr. 12 at 78-80 [hereinafter Salettel Dep. Dec. 29, 2004]. USHS' president and CEO has testified that he recalled his company showed a loss on its corporate tax returns for the years 1999, 2000 and 2001. Def.'s App. Dep. Tr. 15 at 187 [hereinafter Soldo Dep. Jan. 5, 2005]. He also testified at a separate deposition that his IRS Form 1120-S for the year 2002 reflected an operating loss of

$1,108,617.  Def.'s App. Dep. Tr. 17 at 278:7-20 [hereinafter Soldo Dep. Mar. 1, 2007].

_____

      C.   <u>Evidence of Conspiracy</u>

         The record contains several documents that USHS contends reflect the existence of an anticompetitive agreement between Scotts and Griffin.

(1)  A note written in 1999 by William Kusey, a Scotts officer, memorializes a meeting with Griffin [the "Kusey Note"].  Toward the end of the note, Kusey wrote, "1.  Griffin drop Nutricote, Hoffman, Pro-Gro [Scotts competitors] if Scotts drops [USHS]—their offer.  2. [Scotts] counter offer? Drop all competing WSF & Fatard [a Griffin competitor]."  Def.'s Ex. 54.

(2)  Another memorandum sent to Griffin from Bill McEvoy of Scotts on December 21, 1999, discusses Griffin's concern over USHS' pricing [the "Dinosaur Memorandum"].  The memorandum states that "the [USHS pricing] is not in sync with Scotts' distributor strategy of profitability with our products."  The memorandum states at the end that "historically, distributors that engage in such pricing practices have traveled the road of the Dinosaurs."  Pl.'s Ex. 107.

(3)  An internal email sent by Lisa Wallace, a Scotts credit officer, on December 8, 2000, states that USHS would not release to Scotts its financial information, but that USHS claimed a 10% increase in sales.  Wallace stated that she recommended maintaining USHS' credit line at $2 million over the course of the next year, but that Scotts should "focus during this one year renewal period, upon positioning others to fill in the gap that [USHS] would leave."  Pl.'s Ex. 28.

(4)  An email chain contains a conversation between Ronald Soldo, the President and CEO of USHS, and Philip Trump of Scotts.  Soldo complains that he

has heard about Scotts' employees "telling the trade that [USHS' private label WSF] is an inferior brand."  Trump responded that he had never told any "trade end user customer" such a thing.  A hand-written note on the print-out of this email chain reads, "Ron on a new war path! Let's reactivate Griffin partnership in PA[;] discussion asap."  Pl.'s Ex. 126.

Apart from these four documents, USHS identifies facts relating to the circumstances of Scotts' non-renewal of the distributor contract, along with deposition testimony, as evidence of an illegal conspiracy to terminate USHS.

First, the record contains deposition testimony offered by Scotts' employee Michael Kelty stating that one factor in choosing not to renew the 1996 Distributor Agreement was that "sales of Osmocote were being sold at aggressive pricing."  Kelty went on to testify that "Osmocote is a leading brand of The Scotts Company, and we want it to be sold in the market–extract the value from the marketplace.  And we didn't want a distributor going out and selling it, you know, at low prices, being consistent with managing the brand, stewarding the brand."  Pl.'s Ex. 31 at 22:13-24 [hereinafter Kelty Dep.].

USHS identifies the Scotts-Griffin contract regarding distribution of the Ficote variety of CRF as further evidence of conspiracy.  The contract states that Griffin will "eliminate Meister, Multicote and Poly-On

controlled release fertilizer products from its distribution system by [September 30, 2008] and thereafter, so long as this Agreement is in effect, purchase only controlled release fertilizer manufactured by Scotts (Excluding Nutricote)." Pl.'s Ex. 179 at 14.

With respect to Nutricote, several statements are in the record regarding its status as a competitor with Scotts' CRF. Two of these statements are relevant to the issue of conspiracy. First, USHS' President and CEO has testified that in 1998 Nurticote "was making a huge inroad on the indoor use." Soldo Dep. Jan. 5, 2005 at 177:23. Second, a letter sent on May 12, 1998, from the President and CEO of USHS to Chris Treadgill at Scotts stating that Nutricote was making inroads in the CRF Greenhouse market. The letter also states that "three major distributors who were former Scotts distributors . . . are now actively selling Nutricote against Scotts." Pl.'s Ex. 71.

USHS offers several documents purporting to show that prices of CRF increased after Scotts' non-renewal of the distributor contract with USHS, consistent with the goals of the alleged conspiracy. The first of these documents is a declaration offered by an accountant, Jeffery Press, who stated that he reviewed sales records produced by USHS and Griffin in relation to this case. Press states

that he found "105 instances in which customers that had purchased select Scotts CRF products during the period 1999 through 2002 paid increased prices of at least 10% during the period 2003 through 2005."  Pl.'s Ex. 165, ¶¶ 4-5.[2] Finally, the record contains a chart, produced by Scotts, illustrating the trend in its CRF margins.  The chart reflects that from the years 1999 to 2002, Scotts margins decreased gradually.  From the beginning of 2002 to 2003, however, the chart reflects an up-tick in CRF margins. Pl.'s Ex. 159.

D.  Evidence Pertaining to Markets

USHS' theory of this case involves a vertical price fixing conspiracy.  The complaint alleges a product market for CRF sold to nurseries and alleged geographic markets of the United States (at the wholesale level) and the mid-Atlantic and New England (at the retail level).

---

[2]The defendants have objected to the admission of the Press Declaration, which was taken after the deadline for fact discovery and after the plaintiffs had received Scotts' motion for summary judgment.  Because the Court finds that the motion for summary judgment should be granted despite the admission of the Press Declaration, Scotts'  motion to strike the declaration is moot.

1    <u>Geographic Markets</u>

a.    <u>Geography at the Wholesale Level</u>

Scotts sells its products worldwide.  To support its assertion of a "United States" market, USHS offers three internal documents produced by Scotts.  The first is a map of the United States with the heading "Geographical Distribution–All Products." A sub-heading states "Scotts 2003 Sales by State," and a list contains the "Top 10 Hort States."  The map's coloration symbolizes the dollar value of sales within each state, with the heaviest sales in states producing $2-$11 million and the lowest sales in states producing $0-$200,000.  Pl.'s Ex. 7.

A second map, this time of the continental United States only, is titled "Production Sites."  Dots of a certain color signify the location of production sites of CRF.  USHS has asserted that Scotts' market for all products was the United States (with regional markets for CRF in a "northern" region). The map shows that, for all products, Scotts had eighteen production sites located across the country.  These sites are concentrated along the East coast, with four sites in the mid-West, two sites in Mississippi, and two sites in California. Pl.'s Ex. 8.

A third map is included in a presentation slide with the title "Geographical Distribution–All Products."  Two bullet-points on the slide seem unrelated to the map itself.  The

"[m]aps denote: [1] "Ship-to" distributor addresses; [2] Direct grower shipments."  The map itself, however, appears to be an exact copy of the first map discussed above with respect to Scotts' 2003 sales by state.  Pl.'s Ex. 155.

USHS also offers a series of charts capturing Scotts' percentage share of the "North America Horticultural Input Market."  This document reflects that Scotts at one point realized fifty percent of the total sales of CRF in North America.  Pl.'s Ex. 80.  Although this document pertains to "North America," USHS has asserted that Scotts internal documents (discussed above) make clear that the United States was the only relevant geographic area within North America.  Pl.'s Opp'n at 87.

Scotts points to a document in the record suggesting that North America is a relevant geographic area.  This document is a print-out of a presentation entitled "Professional Business Group Business Review."  The document contains the first two maps of the United States discussed above.  Along with those maps, the presentation contains slides which discuss Scotts' competitive position in terms of a North American horticultural input market.  Def.'s Ex. 58.

Within North America, Scotts divides its sales of CRF between three geographic regions: "Northern," "Southern," and "Western."  Def.'s St. at 3.  Although USHS asserts that the

17

relevant market at the wholesale level is the United States, it has also "acknowledged that a CRF market corresponding to Scotts' 'northern' region existed owing to the technological superiority of Scotts' CRF in temperate climates."  Pl.'s Opp'n at 88. Scotts defined the Northern Region, at issue in this case, to include 26 states: Connecticut, Delaware, Iowa, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Maryland, Maine, Michigan, Minnesota, Missouri, North Dakota, Nebraska, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, South Dakota, Virginia, Vermont, Wisconsin and West Virginia.  Def.'s St. at 3 n.2; Def.'s Ex. 27.

Scotts also produced a chart describing its "Market Share" in each of the Scotts "Regional Sales Areas."  Pl.'s Ex. 11.  This document reflects a 75% market share in CRF in the "North."  Id.  The document does not break down this assessment by individual varieties of CRF.  Finally, another Scotts document estimates that in 2004, 85% of the "CRF Market" was "nursery oriented," as opposed to greenhouse or other growing methods. Pl.'s Ex. 82.

b.   Geography at the Retail Level

At the retail, or distribution, level of competition, USHS contends that CRF distributors competed in both a mid-Atlantic and a New England market.  To establish these markets

18

USHS relies in part on an article entitled "Distributors Provide a Critical Link" from a publication called "Nursery Supplies." The document states that "[i]n almost every type of industry today . . . distributors provide an important link between manufacturers and the users of products." Among the reasons for the importance of this link is the fact that distributors "maintain local inventories . . . [a]nd they have developed close working relationships with their customers." The article goes on to state that distributors provide "one-stop shopping for a full line of related products" and "quick delivery from local inventory." Pl.'s Ex. 9. The policies that may reflect the existence of a mid-Atlantic and New England market are contained within the Distributor Agreements, discussed above, which contain clauses pertaining to "territorial restrictions." Pl.'s Ex. 99 at 2, 9.

USHS offers several documents written by the parties' agents as proof of a mid-Atlantic and New England market. First, in a letter from the President of Griffin, Richard Hyslip, to the President and CEO of USHS, Ronald Soldo, Hyslip laid out the benefits of a potential merger between the two companies. He wrote that the two companies "are the leaders in the horticulture industry in both the mid-Atlantic and northeast regions." Pl.'s Ex. 128.

19

An internal memorandum from Scotts discusses the distribution of "Sierra II soils."  This memorandum enumerates certain concerns that Scotts had with the possibility of permitting USHS to distribute its soil products.  Among these concerns was that USHS had "started diluting distributor margins to 3% on Scotts premium Metro-Mix® product line . . . and reduced market price by using anticipation discount to apparently generate cash flow."  The document states that this reduction in market price threatened "Griffin's support of Scotts large marketshare in New England (CT)."  Pl.'s Ex. 14.  This document does not state whether the New England market, as conceived in the memorandum, included states outside of Connecticut, nor does it state whether the market pertains to the retail level ("Scotts large marketshare").

Finally, USHS offers portions of three declarations to demonstrate the existence of retail markets confined to the mid-Atlantic and New England.  The first declaration was offered by Charles Elstrodt, director of technical services at a manufacturer of CRF.  Mr. Elstrodt stated that "in terms of other distributors of professional horticultural products in the New England and mid-Atlantic regions who may have been competitors of [USHS] just prior to October, 2002, [USHS'] primary competitor in the market for professional horticultural products generally was Griffin."  He goes on to estimate Griffin's percentage of sales

20

in the "New England region" and in the "mid-Atlantic market."
Pl.'s Ex. 15, ¶¶ 12, 13.

The declaration of Ross Williams, former sales and
marketing officer at Scotts, also references the mid-Atlantic and
New England regions.  The declaration states that "prior to
Griffin taking over [USHS'] business after Scott's termination of
[USHS] in October 2002, Griffin was already the dominant
distributor of professional horticultural products in the New
England region."  Williams "estimated" that Griffin became the
dominant distributor in the mid-Atlantic region following its
acquisition of USHS.  Pl.'s Ex. 16, ¶¶ 12-13.[3]

A declaration submitted by Ronald Soldo, USHS'
President and CEO, contains a statement relevant to proving the
existence of retail markets.  Soldo stated that "nurseries and
greenhouses have a strong preference for regional distribution as
they [want] personal service and a quick response to their
professional horticultural needs."  Pl.'s Ex. 83, ¶ 11.

---

[3]Scotts has objected to the offer of the Elstrodt and
Williams declarations as being untimely under the Federal Rules
of Civil Procedure and without a basis in the either man's
personal knowledge.  Because the Court finds that the motion for
summary judgment should be granted despite the assertions in
these declarations, Scotts' objections to their inclusion in the
record is moot.

2.   Product Market

The only product that USHS asserts as a basis for its claims is CRF sold to nurseries.  USHS relies on several documents and statements in the record to support its claim that there is a product market comprised of CRF sold to nurseries. USHS cites to a document produced by Scotts with the title "Scotts PBG Americas Competes in Four Key Categories Against a Variety of Single Product Line Competitors."  The document includes four pie-charts, each of which contains Scotts' assessment of its own percentage of sales of a product.  The charts illustrate Scotts' sales of CRF, growing media, PPP and WSF.  For the chart referring to CRF, the document includes a label stating "Controlled Release Fertilizer Market."  Pl.'s Ex. 171.  A substantially identical document contains the same four pie-charts and labels, including a label reading "Controlled Release Fertilizer Market."  Pl.'s Ex. 3.

A similar document, outlining categories of Scotts' products, refers to CRF as a product sold under the heading "nurseries," as well as under the headings "Specialty Ag" and "Landscape."  Pl.'s Ex. 4.  An internal document produced by Scotts as a "Regional Sales Analysis" discusses Scotts' "market share" in certain products and regions.  Under the heading "Hort," a chart states that in the "North" Scotts held a 75% market share for CRF.  Pl.'s Ex. 11.  Finally, an internal Scotts

document titled "Controlled Release Fertilizer" discusses the "Brand Environment."  The document states that Scotts is the CRF market leader, with a 50% market share.  Pl.'s Ex. 32.

        USHS also submits a report written by its liability expert, John L. Solow, to establish that CRF constitutes a product market.  Doctor Solow states that "at the retail level, distributors sell CRF and PPP to nurseries, and WSF, PPP and growing media to greenhouses."  Solow states that these products are complements, rather than substitutes.  Solow claims that this demonstrates that the relevant product market does not include all of these products together.  Solow notes that "other indicia also suggest that sales of CRF to nurseries, WSF and growing media to greenhouses, and PPP to nurseries and greenhouses are separate product markets."  He cites to the fact that Scotts organized its Professional Business Group into a nursery group and a greenhouse group.  At the wholesale level, Solow opines that the same CRF market exists and states that growing media, WSF and PPP are, again, complements rather than substitutes.  He also cites to the deposition testimony of Richard Hyslip, President of Griffin, for support of the position that distributors "need to carry a full line of products in order to compete effectively."  Pl.'s Ex. 1 at 8-9.[4]

_____

    [4]The defendants have filed a <u>Daubert</u> motion seeking to
exclude the testimony of Dr. Solow.  The Court finds that, even
including the liability expert's testimony, the motion for
summary judgment should be granted. The Court, therefore, will

II.  <u>Analysis</u>

   Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or
> otherwise, or conspiracy, in restraint of trade or
> commerce among the several States, or with foreign
> nations, is declared to be illegal . . . .

15 U.S.C. § 1.

   The United States Court of Appeals for the Third

Circuit has recently restated the elements of a Section 1 case.

> [T]o succeed on a § 1 claim, a plaintiff must meet two
> requirements. First, the plaintiff must show that the
> defendant was a party to a "contract, combination . . .
> or conspiracy." Second, the plaintiff must show that
> the conspiracy to which the defendant was a party
> imposed an unreasonable restraint on trade.

<u>Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.</u>, 530 F.3d

204, 218 (3d Cir. 2008).  The parties concur that this case must

be decided under a rule of reason analysis, which requires proof

of an unreasonable restraint on trade.  <u>Leegin Creative Leather

Products, Inc. v. PSKS, Inc.</u>, 127 S.Ct. 2705 (2007).[5]

---

address Solow's report as a part of the evidence on record.

  [5]The parties' briefs dispute who has the burden of
persuasion and production of evidence in an antitrust summary
judgment motion.  The Supreme Court has held that antitrust cases
do not shift burdens of production or persuasion from the normal
summary judgment situation.  The plaintiff may not merely rest on
its allegations, but must offer evidence that can be reasonably
held to satisfy the elements of the claim.  <u>Eastman Kodak Co. v.
Image Technical Services, Inc.</u>, 504 U.S. 451, 468 n.14 (1992)
(citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986)).  The burden of demonstrating that no genuine issue of
material fact exists remains upon the defendant.

A.   No Evidence of Conspiracy Sufficient to Survive Summary
     Judgment

In assessing whether the plaintiff has made a showing of conspiracy sufficient to survive summary judgment, courts may be limited in the inferences they may draw from the plaintiff's proffered evidence. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a section 1 case . . . . [C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986) (citations omitted).

Moreover, the United States Court of Appeals for the Third Circuit has discussed the clarity and persuasiveness of evidence that a plaintiff must proffer in a Section 2 case. Courts must approach record evidence related to a motion for summary judgment in an antitrust suit differently, depending on the plausibility of the plaintiff's theory of the case.

> "[I]f the claim is one that simply makes no economic sense[,] a plaintiff must come forward with more persuasive evidence to support its claim than would otherwise be necessary." Rossi v. Standard Roofing, Inc., 156 F.3d 452, 466 (quoting Matsushita, 475 U.S. at 587) (punctuation omitted).   Finally, "in evaluating whether a genuine issue for trial exists, the antitrust defendants' economic motive is highly relevant. If the defendants had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct

does not give rise to an inference of conspiracy." <u>Id.</u>
(quoting <u>Matsushita</u>, 475 U.S. at 596) (punctuation
omitted).

<u>Toledo Mack Sales & Serv., Inc.</u>, 530 F.3d at 219 -220 (3d Cir.

2008).  Finally, the Court of Appeals has held that these limits

on permissible inferences do not apply to a plaintiff's direct

evidence of an unlawful agreement under Section 1, but only to

circumstantial evidence.  <u>Id.</u>

        Following <u>Toledo Mack</u>, the Court must examine the

evidence presented by USHS to determine the nature of that

evidence:  whether it is direct or circumstantial.  If entirely

circumstantial, the Court must determine whether the totality of

that evidence would be "as consistent with permissible

competition as with illegal conspiracy."  <u>Id.</u> at 219.

Circumstantial evidence that would equally support a finding of

either unilateral action or illegal collusion is not enough to

survive summary judgment; "[t]here must be evidence that tends to

exclude the possibility" of unilateral action. <u>Monsanto Co. v.

Spray-Rite Service Corp.</u>, 465 U.S. 752, 764 (1984).[6]  If the

---

        [6]USHS, citing <u>In re Flat Glass Antitrust Litigation</u>, 385
F.3d 350 (3d Cir. 2004), argues that "the 'strictures of
<u>Matsushita</u>' should not apply, and inferences of conspiracy from
circumstantial evidence warrant no special 'caution,' except in
cases in which . . . the plaintiff's conspiracy theory is
facially 'implausible' <u>and</u> an inference of conspiracy [would
deter procompetitive conduct]."  Plf.'s Sur-Rep. at 4.  This is a
misstatement of law.  There is always a higher level of caution
whenever the plaintiff provides solely circumstantial evidence of
collusion.  In such a case, not only must the plaintiff's theory
survive scrutiny of its plausibility, but the circumstantial
evidence must tend to exclude the possibility of independent

plaintiff offers direct evidence of concerted action, then the plaintiff has established that a genuine issue of material fact exists as to that element of the claim.

### 1.   USHS Offers No Direct Evidence of Conspiracy

"Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." In re Baby Food Antitrust Litigation, 166 F.3d 112, 118 (3d Cir. 1999).  All of the evidence USHS presents is circumstantial evidence of conspiracy.

USHS argues that two pieces of evidence constitute direct evidence of conspiracy:[7] (1) the Kusey Note, and (2) the Dinosaur Memorandum.  Pl.'s Ex. 105, 107.  The Kusey Note memorializes an offer made by Griffin to limit its suppliers in

_____

action and support a conclusion of collusive action.  Flat Glass recognizes that no higher level of caution applies in the face of direct evidence of a conspiracy.  Id. at 357 n.7.

[7]USHS argues in its opposition brief to the motion for summary judgment that the Court of Appeals does not distinguish between direct and "strong circumstantial" evidence for purposes of analysis under Matsushita.  USHS Opp'n at 49 (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1233 (3d Cir. 1993)).  Petruzzi's states that both direct and strong circumstantial evidence can overcome an implausible theory of conspiracy.  998 F.2d at 1231-33.  Still, in the absence of direct evidence, the Matsushita analysis applies to all circumstantial evidence, strong or not, and Matsushita's limitations on inferences of conspiracy will apply.  To overcome an implausible theory of conspiracy, a plaintiff must put forth strong circumstantial evidence if the plaintiff lacks direct evidence.

return for Scotts' limitation of distributors.  To stand as proof
of conspiracy, a jury would need to infer that this offer was
accepted; the document itself is not direct evidence of an
agreement.  The Dinosaur Memorandum requires a similar inference.
Namely, a jury would need to infer that the author's euphemism
"go the way of the Dinosaurs" refers to a history of terminations
by Scotts of relationships with distributors who were unwilling
to follow Scotts' pricing preferences, as opposed to such
distributors' self-imposed failure due to their own shortsighted
pricing policies.

>           2.   USHS' Circumstantial Evidence of Conspiracy Does
>                Not Tend to Exclude the Possibility of Unilateral
>                Action and Gives Rise to No Reasonable Inference
>                of Conspiracy

Because all of the evidence of conspiracy on record is
circumstantial, the limitations on permissible inferences of
conspiracy enunciated in Matsushita apply.  475 U.S. 574.
Accordingly, the Court must first assess the plausibility of the
plaintiff's theory of the conspiracy based on the economic
rationality of such a conspiracy and any rational motives the
defendants may have had to form an anticompetitive agreement.  If
the Court finds that theory implausible, the plaintiff's
circumstantial evidence must strongly suggest the existence of
such an agreement in order to provide an inference that can
survive summary judgment.  Toledo Mack Sales & Serv., Inc., 530

F.3d at 219.  Whether a claim is plausible relates to the factual context of the claim.  <u>Rossi</u>, 156 F.3d at 466.  Regardless of the theory's plausibility, the law requires the plaintiff to put forth evidence tending to exclude the possibility of unilateral action.  <u>Toledo Mack Sales & Serv., Inc.</u>, 530 F.3d at 219-220.

         a.    <u>The Plaintiff's Claims are Implausible</u>

         The Court finds the plaintiff's theory of the conspiracy to be implausible for four reasons.  First, the plaintiff's theory is implausible based on the chronology of the alleged conspiracy.  According to the plaintiff, Scotts and Griffin decided in 1998 to squeeze USHS out of the CRF-sold-to-nurseries market in several states in the mid-Atlantic and to prevent USHS' entry into that market in New England.  USHS posits that it was finally terminated in accordance with this plan in the second half of 2002.  A four-year gap between the alleged agreement to undermine USHS' business and the culmination of that plan makes the plaintiff's theory facially implausible.

         USHS asserts that the delay between the planning and execution of this conspiracy was due to the need for Scotts and Griffin to prepare the market for the change in the competitive landscape.  Oral Arg. Tr. 51-52, 91, Nov. 4, 2008.  This assertion does not make the plaintiff's theory more plausible.  Undisputed evidence demonstrates that Griffin was already

positioned in the relevant portions of the mid-Atlantic as early
as 1997.  Def.'s St. at 15-16.  The gap between agreement and
execution, therefore, cannot be explained away by asserting that
the defendants needed this four-year period to prepare customers
for a switch in distributors of Scotts' products.

Second, the option provided to USHS by its
distributorship agreement of expanding its operations into Texas
and Louisiana also speaks to the implausibility of a
contemporaneous agreement between Scotts and Griffin to deny USHS
access to new customers in that territory.  USHS was in a
position to effect an expansion into these two states upon its
own volition.  Had USHS established a physical presence in Texas
or Louisiana, Scotts would have been obligated to facilitate that
expansion by providing USHS' customers with Scotts' product.

In addition to obligating itself to support USHS'
expansion efforts, Scotts further strengthened USHS' business
over the course of the relevant time period by entering into two
new distribution contracts and increasing USHS' credit line to $3
million.  The undisputed evidence of Scotts' support of USHS'
business makes the plaintiff's alleged conspiracy all the more
implausible.

Third, the plaintiff's theory does not plausibly
account for Scotts' most recent contracts with USHS: the Grocote
and Ficote agreements.  These distribution contracts permit USHS

30

to continue to sell certain varieties of CRF to nurseries within the territory at issue.  The Court finds it implausible that Scotts would permit USHS to continue to sell its CRF in direct contravention of the alleged goals of its anticompetitive conspiracy.[8]

Finally, the Court is asked to find plausible a theory of conspiracy that ignores the unambiguous evidence of USHS' repeated refusal to provide its supplier with requested financial information.  Record evidence reflects that Scotts had long considered this refusal to provide financial records an added risk of doing business with USHS, especially following the bankruptcy of Geiger South.  Despite this risk, undisputed evidence demonstrates that Scotts provided USHS with a credit line that even USHS considered high.  Def.'s Ex. 41.  Scotts' actions do not comport with a plausible theory of an anticompetitive agreement between Scotts and Griffin.

b.    The Evidence Does Not Tend to Exclude the
          Possibility of Unilateral Action

None of the evidence offered by USHS, taken individually or as a whole, tends to exclude the possibility of

---

[8]The Court notes that, at times, USHS claims that these CRF varieties are of a different quality than those varieties that Scotts ceased to provide to USHS and that they do not mitigate the impact of Scotts' non-renewal.  This claim, of course, undermines the repeated assertion that "CRF sold to nurseries" constitutes a single product market.  See infra Part II(B)(1).

unilateral action in Scotts' non-renewal of the USHS distribution agreements.  Such evidence cannot provide the inferences necessary to survive summary judgment.  Viewing the evidence through the lens of Matsushita, the Court finds that USHS presents evidence from which no reasonable inference of conspiracy can be drawn.  InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 168 (3d Cir. 2003).

The first piece of circumstantial evidence is the Kusey Note.  The note memorializes an offer made by Griffin to a Scotts' officer communicating Griffin's interest in a deal that would preclude each company from doing business with certain competitors of the other company.  The note states "Griffin drop Nutricote, Hoffman, Pro-Gro [Scotts competitors] if Scotts drops [USHS]."  The note then states: "2. [Scotts] counter offer?  Drop all competing WSF & Fatard [a Griffin competitor]."  Def.'s Ex. 54.  Taken by itself, the note is as consistent with unilateral action as with conspiracy; the note does not state that Scotts ever agreed to the proposal.

Taken in the context of the entirety of the evidence and the chronology of the relationship between USHS and Scotts, the note does not tend to establish that Scotts' 2002 non-renewal of the distribution agreement with USHS was the product of an anticompetitive conspiracy involving Griffin.  First the results of the potential counter-offer never materialized.  Second,

Griffin's offer with respect to Nutricote has never materialized. Griffin continued to sell Nutricote products at least until 2007. Hyslip Dep. at 41:15-42:4.  Finally, this note, written in 1999, predates Scotts renewal of the 1996 Distributor Agreement in 2001 and the expansion of USHS' credit line.

The balance of USHS' circumstantial evidence tends only to confirm that Scotts made preparations for the termination of its relationship with USHS.  The Dinosaur Memorandum, cited by USHS as evidence of a conspiracy, discusses Griffin's concerns over USHS' low pricing policies.  Bill McEvoy of Scotts wrote that distributors who pushed low prices on Scotts' products "have traveled the road of the Dinosaurs."  Pl.'s Ex. 107.

This memorandum does not contain any evidence of a meeting of the minds between Scotts and Griffin.  It does not reflect the planning or achievement of any conspiratorial goals. The reference to the "road of the dinosaurs" is as or more consistent with a discussion of the non-viability of distributors who maintain tight profit margins as with an anticompetitive conspiracy.  The mere fact that Scotts was writing to Griffin in response to Griffin's complaint does not tend to exclude the possibility of independent action.  See Toledo Mack Sales & Serv., Inc., 530 F.3d at 222-223 (noting that a defendant supplier's response to dealer complaints is not enough in itself to show conspiracy).

33

USHS next points to an internal email sent by Lisa
Wallace of Scotts' credit department on December 8, 2000.  This
email recommends maintaining a $2 million credit line for USHS
despite the fact that USHS repeatedly refused to release
financial information to Scotts upon request.  The email states
that Scotts should "focus during this one year renewal period,
upon positioning others to fill in the gap that [USHS] would
leave" in the event that Scotts refused to offer any further
renewal.  Pl.'s Ex. 28.

This email demonstrates that two years after the
alleged conspiracy initiated, Scotts was recommending the
extension of a $2 million line of credit to a noncompliant
distributor.  After this email, Scotts continued to supply a full
range of products to USHS for another two years.  The email was
internal to Scotts and not sent to anyone at Griffin.  Each of
these considerations renders this email a particularly ambiguous
indicator of conspiracy and, indeed, bolsters Scotts' argument
that USHS' distributorship was not renewed in part due to a poor
working relationship.  The evidence, therefore, does not tend to
exclude the possibility of unilateral action.

USHS next offers a note written on a print-out of an
email conversation between Scotts and USHS.  The email
conversation involves USHS' accusation that Scotts had been
denigrating USHS' private label products within the industry.

34

The replies from Scotts denied the accusation.  The hand-written note states: "Ron [USHS' President and CEO] on a new war path! Let's reactivate Griffin partnership in PA . . . ."  Pl.'s Ex. 126.

As with the prior pieces of evidence regarding an unlawful conspiracy, this note does not outline the terms of any illegal agreement or act as evidence that Scotts was acting in anything but its unilateral best interest.  The note does not state in what the Griffin partnership in Pennsylvania consisted. The emails and the note are clear evidence of a deteriorating relationship between Scotts and USHS.  This evidence does not tend to exclude the possibility of unilateral action and is not the kind of unambiguous circumstantial evidence required to overcome the implausibility of USHS' theory of the conspiracy.

USHS next identifies the Scotts-Griffin contract regarding distribution of the Ficote variety of CRF as further evidence of conspiracy.  The contract requires Griffin to eliminate three suppliers of CRF and purchase CRF only from Scotts.  The contract specifically excludes Scotts' competitor Nutricote from this agreement, permitting Griffin to sell Nutricote's CRF products.  Pl.'s Ex. 179.

The contract does not provide unambiguous evidence of a conspiracy for several reasons.  First, USHS' President and CEO has recognized that Nutricote is a competitor of Scotts' in

precisely the market in which the alleged conspiracy was meant to
have its impact. Soldo Dep. Jan. 5, 2005 at 177:21-23.[9]  USHS
wrote a letter to Scotts stating that distributors were selling
Nutricote directly against Scotts' products.  Pl.'s Ex. 71.
Second, the contract was executed on April 8, 2003, and the
addendum requiring that Griffin eliminate certain Scotts
competitors was not applicable until September 30, 2003.  Pl.'s
Ex. 179 at 14.[10]  This means that the quid pro quo alleged in
USHS' theory of the conspiracy did not materialize until one year
after Scotts refused to renew the USHS distributorship.  Finally,
the agreement says nothing about Scotts termination of USHS or
any other Griffin competitor.  The contract does not tend to

---

[9]The evidence presented by USHS is ambiguous as to whether
Nutricote was a Scotts competitor and highlights the ambiguity in
USHS' product market definition.  At times, USHS identifies
Nutricote as a competitor to Scotts' CRF.  Soldo Dep. Jan. 5,
2005 at 177-178; Pl.'s Ex. 71.  At other times, USHS attempts to
disaggregate the CRF-sold-to-nurseries market by arguing that
Nutricote did not perform well in colder climates and, therefore,
was not a true competitor to Scotts' CRF.  Pl.'s Sur-Rep. at 18.
Not only does this attempted disaggregation reflect the over-
breadth of USHS' definition of the product market, as discussed
below, it also highlights USHS' confusion as to the usefulness of
the Scotts-Griffin contract as evidence of a conspiracy.

[10]USHS states that "a Scotts' witness testified that this
contractual restriction on interbrand competition was the
continuation of a pre-existing oral agreement between Scotts and
Griffin."  Pl.'s Opp'n at 53.  The exhibit cited in the
plaintiff's brief does not contain such testimony or support this
assertion.  Even if such testimony was offered, a pre-existing
oral agreement that allowed Griffin to sell Nurticote would still
not reflect an illegal agreement to terminate Scotts'
competitors.

exclude the possibility of unilateral action with respect to Scotts' relationship with USHS.

USHS next identifies statements by Scotts' employee Michael Kelty as evidence of a conspiracy between Griffin and Scotts.  Kelty testified that "sales of Osmocote [the brand name for Scotts' CRF] were being sold at aggressive pricing" and that Scotts "didn't want a distributor going out and selling it . . . at low prices, being consistent with managing the brand, stewarding the brand."  Kelty Dep. at 22:13-24.  This statement is offered to prove Scotts' motive in terminating USHS, but that motive is as consistent with unilateral action as with a conspiracy between Scotts and Griffin.

USHS offers several examples of evidence purporting to show that prices of CRF in fact increased after Scotts' non-renewal of the distributor contract with USHS.  Such a price increase would be consistent with the goals of the alleged conspiracy, which would be circumstantial evidence of the existence of a conspiracy.  The first example is a declaration offered by Jeffery Press, an accountant, stating that review of sales records produced by USHS and Griffin contained "105 instances in which customers that had purchased select Scotts CRF products during the period 1999 through 2002 paid increased prices of a least 10% during the period 2003 through 2005."

Pl.'s Ex. 165, ¶¶4-5.[11]  USHS also points to a chart produced by
Scotts that reflects a rise in Scotts' profit margins on sales of
CRF following its termination of USHS.  Pl.'s Ex. 159.  Although
each document reflects the fact that Scotts' business in the CRF
market improved following USHS' termination, neither document
speaks unambiguously to the issue of a conspiracy between Scotts
and Griffin.  The benefits that accrued to Scotts from 2002 to
2005 are as consistent with unilateral actions taken by Scotts'
to improve its position in the CRF market as they are with an
agreement between Scotts and Griffin to undermine USHS' position.

        Taking each piece of evidence individually and viewing
the evidence as a whole, USHS does not provide evidence that
"tends to exclude the possibility" of unilateral action.
Monsanto Co., 465 U.S. at 764.  Neither the Kusey Memorandum nor
the notes written on the print-out of emails between USHS and
Scotts tend to exclude the possibility that Scotts acted
unilaterally in its decision not to renew USHS' distributorship.
The context of each document only emphasizes the plaintiff's

---

        [11]After several reschedulings, an amended scheduling order
was issued on March 5, 2008, after USHS had received Scotts'
motion for summary judgment, setting the date for response to
dispositive motions as April 7, 2008.  This declaration was
signed on April 7, 2008, meaning that it was made after USHS had
an opportunity to view Scotts' motion for summary judgment.  The
declaration is the subject of a motion in limine filed by Scotts
seeking to exclude certain affidavits and declarations submitted
by USHS after the close of fact discovery.  Because the Court
finds that Scotts' motion for summary judgment should be granted
even with the inclusion of this declaration, the motion in limine
is moot.

failure to demonstrate a conspiracy by highlighting the legitimate reasons for Scotts to take unilateral action to separate itself from USHS.

The Kusey Memorandum and the email chain and note are the closest that USHS has come to showing evidence of a conspiracy.  Other evidence only offers reasons for Scotts' desire to cut off USHS, but says nothing about the manner in which the termination occurred.  Taken together and in a light favorable to USHS, this evidence paints a picture of a troubled relationship between Scotts and USHS, which ended in a termination of that relationship and increased profits as a result of that termination.  Especially in light of the implausibility of USHS' theory of the conspiracy, this evidence is not enough to provide the basis for an inference of conspiracy under Matsushita.  475 U.S. 574.

Even were the facts of this case to present a plausible theory of conspiracy, the circumstantial evidence offered by USHS would remain "as consistent with independent behavior as it is with price-fixing." In re Baby Food, 166 F.3d at 127.  Because the evidence is at best equally consistent with both unilateral and conspiratorial conduct, Matsushita does not permit the evidence to stand as the basis for a "reasonable inference" necessary to survive a motion for summary judgment.  InterVest, Inc., 340 F.3d at 160 (citing Matsushita, 475 U.S. at 588).

c.    Comparable Section 1 Cases

USHS argues that the evidence it offers of an illegal conspiracy is more probative of conspiracy than that offered in similar Section 1 cases.

(1). Arnold Pontiac

USHS first cites to Arnold Pontiac-GMC v. General Motors Corp., 786 F.2d 564 (3d Cir. 1986)("Arnold Pontiac I").[12] In that case, a car dealership sued four competing dealerships and a car manufacturer from which it purchased cars for resale. A key piece of evidence that tended to exclude the possibility of independent action was a memorandum written by an officer of the manufacturer following a meeting with the four defendant dealers. That memorandum stated that the dealers had agreed to a group

_____

[12]Arnold Pontiac I reversed the decision of the District Court to grant summary judgment to the defendant manufacturer. Arnold Pontiac I, however, was decided prior to the Supreme Court's decision in Matsushita.  A petition for rehearing of Arnold Pontiac I, filed prior to Matsushita, was stayed pending the Matsushita decision.  After Matsushita, the Court of Appeals denied the petition for rehearing.  Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc., 826 F.2d 1335, 1337-38 (3d Cir. 1987) ("Arnold Pontiac II").  Arnold Pontiac II stated that the evidence in Arnold Pontiac I tended to exclude the possibility of independent action by the defendant manufacturer, validating the earlier decision to reverse the district court.  Arnold Pontiac II, 826 F.2d at 1338.  The Court, along with the parties, views the Court of Appeals' decision in Arnold Pontiac I, to have applied the Circuit's Monsanto standard consistently with the later-enunciated Matsushita analysis, as demonstrated in Arnold Pontiac II.

boycott of the manufacturer if the manufacturer allowed the plaintiff to act as a dealer for a certain model of car produced by the manufacturer.  Id.  The memorandum was not direct evidence of a vertical conspiracy because an inference was still required to find that the manufacturer had responded to this threat by agreeing to discriminate against the plaintiff.

The factual context in which the memorandum was presented was significantly different from the context in this case.  Prior to the meeting detailed in the memorandum, the plaintiff and the manufacturer had been preparing the plaintiff to become a franchisee of the manufacturer, exactly what the defendant dealers intended to prevent.  The plaintiff and the manufacturer had previously taken several steps toward completing a franchise agreement.  Following the meeting between the defendants, that progress immediately halted and the plaintiff was eventually denied his expected franchise.  Id.  That context suggested that the manufacturer had indeed responded to the competing dealers' demands by agreeing to call off its cooperation with the plaintiff.

USHS presents evidence of far greater ambiguity. Following the meeting outlined in the Kusey Note, in which no agreement is memorialized, none of the goals hypothesized by USHS came to fruition.  Moreover, the evidence demonstrates that relations between USHS and Scotts continued to progress to USHS'

41

advantage over the course of the next several years following the meeting outlined in the 1999 Kusey Note.  USHS' credit was expanded, even despite its refusal to provide Scotts with relevant financial information, and its distributorship agreement was renewed.

### (2). Monsanto

USHS also argues that its evidence compares favorably to that offered in <u>Monsanto Co. v. Spray-Rite Service Corp.</u>, 465 U.S. 752, 764 (1984).  Although <u>Monsanto</u> predated the Supreme Court's clarification of the proper analysis of evidence of conspiracy in <u>Matsushita</u>, that case still focused on whether the plaintiff had provided evidence "that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently."  <u>Monsanto Co.</u>, 465 U.S. at 764. <u>Monsanto</u> held that evidence of a dealer's termination in response to complaints to a manufacturer from competing dealers did not tend to exclude the possibility of independent action.  <u>Id.</u>

USHS argues that it has offered more than circumstantial evidence of Scotts' reaction to its dealers' complaints.  This, however, does not mean that it has offered sufficiently unambiguous evidence of conspiracy to survive summary judgment.  The plaintiffs in <u>Monsanto</u> had offered <u>direct</u> evidence of a conspiracy, including testimony from an employee of

the defendant that the defendant had "on at least two occasions in early 1969 . . . approached price-cutting distributors and advised that if they did not maintain the suggested resale price, they would not receive adequate supplies of [the defendant's] new corn herbicide."  Id. at 765.

In addition to the direct evidence of conspiracy, several pieces of circumstantial evidence were offered to bolster the showing of conspiracy.  A newsletter written by one competing dealer to his customers stated:

> [W]e are assured that Monsanto's company-owned outlets will not retail at less than their suggested retail price to the trade as a whole.  Furthermore, those of us on the distributors level are not likely to deviate downward on price . . . .  Also, so far as the national accounts are concerned, they are sure to recognize the desirability of retaining Monsanto's favor on a continuing basis by respecting the wisdom of participating in the suggested program in a manner assuring order on the retail level "playground" throughout the entire country.

Id. at 766.

This evidence demonstrated that certain retailers were following pricing practices "suggested" by Monsanto and that would keep those retailers in Monsanto's favor.  The reference to a level playground throughout the entire country is less ambiguous evidence of a concerted plan to maintain high prices than any of the evidence produced by USHS.

43

(3). <u>Toledo Mack</u>

Finally, USHS cites <u>Toledo Mack Sales & Serv., Inc. v.</u>
<u>Mack Trucks, Inc.</u> as a comparable factual scenario.  530 F.3d 204
(3d Cir. 2008).  Mack manufactured a variety of heavy-duty trucks
and allegedly enjoyed significant power within the market for
those vehicles.  Mack distributed its trucks through a nationwide
network of authorized dealers, each of which was assigned to an
"area of responsibility" [AOR].  <u>Id.</u> at 209.  Toledo was an
authorized Mack dealer terminated by Mack allegedly for pursuing
a low-price sales strategy.  Toledo alleged that competing Mack
dealers conspired not to compete with each other on price.  It
also alleged that Mack entered into an agreement with its dealers
that it would delay or deny sales assistance to any dealer who
sought to make an out of AOR sale.  Following trial, but before
jury deliberation, the district court granted judgment as a
matter of law in favor of Mack on Toledo's Section 1 claim. 530
F.3d 204.

Unlike the plaintiff in this case, the plaintiff in
<u>Toldeo</u> presented direct evidence of an anticompetitive
conspiracy.  "Toledo presented evidence that Mack and its dealers
met, discussed, and unanimously approved Bulletin 38-89 [a policy
denying sales assistance to dealers selling out of their AOR]
before Mack issued it." <u>Id.</u> at 223.  The plaintiff in that case
also presented testimony from a Mack official stating that, when

44

Toledo was selling out of its AOR, his supervisor had told him that he knew "what [Toledo] [was] trying to do . . . .  We are not going to let this happen."  Id. at 221.  This direct evidence of an agreement between a manufacturer and its dealers culminating in an official company policy, along with evidence of the manufacturer's intent to enforce that policy, constituted unambiguous evidence of conspiracy.

The evidence of conspiracy offered by USHS in this case falls far short of that presented in the cases it claims as favorably comparable.  Because USHS fails to offer sufficiently unambiguous evidence of an anticompetitive conspiracy between Scotts and Griffin, the motion for summary judgment must be granted.

B.   USHS Fails to Demonstrate an Unreasonable Restraint of Trade

USHS' failure to provide evidence sufficient to create a genuine issue as to the existence of an unreasonable restraint of trade is also fatal to its case.  The lack of evidence pertaining to geographic and product markets, in particular, requires that the Court grant Scotts' motion for summary judgment.

The parties agree that this case must be analyzed under a rule of reason analysis, which requires the plaintiff to demonstrate that the alleged conspiracy produced "adverse,

anti-competitive effects within the relevant product and
geographic markets." Rossi, 156 F.3d at 464.  This can be
achieved by demonstrating facially anticompetitive restraints or
reduced output, increased prices or reduced quality in goods or
services. Gordon v. Lewiston Hosp., 423 F.3d 184, 210 (3d Cir.
2005).  The Court of Appeals for the Third Circuit has also held
that, alternatively, "because proof that the concerted action
actually caused anticompetitive effects is often impossible to
sustain, proof of the defendant's market power will suffice."
Id.  "Market power, the ability to raise prices above those that
would otherwise prevail in a competitive market, is essentially a
surrogate for detrimental effects."  Id.

     The Court finds that USHS has failed to present
evidence sufficient to survive summary judgment with respect to
the definition of the product and geographic markets.  Because
USHS has failed to carry its burden with respect to these
elements, the Court will not address the adequacy of evidence
pertaining to anticompetitive effects or market power.


     1.   USHS Fails to Provide Evidence of Product Markets

     "The outer boundaries of a product market are
determined by the reasonable interchangeability of use or the
cross-elasticity of demand between the product itself and
substitutes for it."  Queen City Pizza, Inc. v. Domino's Pizza,

46

Inc., 124 F.3d 430, 436 (3d Cir. 1997) (quoting Brown Shoe Co. v. U.S., 370 U.S. 294, 325 (1962)).[13]

> Where the plaintiff fails to define its proposed
> relevant market with reference to the rule of
> reasonable interchangeability and cross-elasticity of
> demand, or alleges a proposed relevant market that
> clearly does not encompass all interchangeable
> substitute products even when all factual inferences
> are granted in plaintiff's favor, the relevant market
> is legally insufficient and a motion to dismiss may be
> granted.

Id.   "When assessing reasonable interchangeability, '[f]actors to be considered include price, use, and qualities.' Reasonable interchangeability is . . . indicated by 'cross-elasticity of demand between the product itself and substitutes for it.'" Id. at 437 (citation omitted).

USHS relies on the opinion of its liability expert and on certain of Scotts' internal marketing documents to define the product market in this case as "CRF used by nurseries at the manufacturing level."  Pl.'s Opp'n at 84.[14]  None of this

---

[13]"The economic tool most commonly referred to in determining what should be included in the market from which one then determines the defendant's market share is cross-elasticity of demand. Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product to changes in the price of a different product." Queen City Pizza, 124 F.3d at 438 n. 6 (quoting E. Thomas Sullivan & Jeffrey L. Harrison, Understanding Antitrust and its Economic Implications 217 (1994)).

[14]USHS has asserted that other product markets were affected by Scotts' alleged anticompetitive conspiracy, but confine its claims to CRF because USHS believes it is only this market in which Scotts possessed market power. Pl.'s Opp'n at 84.

evidence contains a discussion of cross-price elasticity of demand.  To the extent that the evidence, including the expert report, discusses reasonable interchangeability at all, it states only that certain products are complements rather than substitutes for CRF without performing any econometric analysis of those, or any other, products within the hypothetical market.

The portion of USHS' expert's report dealing with product markets reads, in its entirety:

> As noted above, this case involves both the wholesale and retail sales of several different horticultural inputs whose end users are professional growers.  At the retail level, distributors sell CRF and PPP to nurseries, and WSF, PPP and growing media to greenhouses.  It is clear that these products are complements, rather than substitutes.  For example, an increase in the price of CRF to nurseries would raise the costs of the nurseries, leading them ultimately to raise prices.  This would reduce the quantity of nursery sales, and would lead to a reduction, not an increase, in demand for PPP and other inputs used by nurseries.  Hence, the availability of PPP would not constrain the ability of a hypothetical single seller of CRF to profit from a supracompetitive price increase.  Other indicia also suggests that sales of CRF to nurseries, WSF and growing media to greenhouses, and PPP to nurseries and greenhouses are separate product markets.  For example, Scotts organized its Professional Business Group into a nursery group and a greenhouse group.  Ross Williams, a former Scotts executive, explained that, " . . . certain products were almost exclusively sold into the greenhouse market and others were sold almost exclusively into the nursery market.  The crossover product line, the primary crossover product line, was crop protection . . . ."  There is no indication that the prices of any other products are considered when setting the price of one of the products, which would be important if the products were substitutes.

At the wholesale level, manufacturers sell
CRF, WSF, PPP and growing media to the distributors who
in turn resell to professional growers.  As they are at
the retail level, these products are complements and
not substitutes at the wholesale level; since retail
customers (i.e., professional growers) cannot
substitute one for another in response to an increase
in the retail price of one, distributors cannot
substitute one product for another in response to an
increase in the wholesale price.  Moreover,
distributors need to carry a full line of products in
order to compete effectively.  Scotts sells all of
these products to distributors; indeed, Scotts is "the
only horticultural supplier with a complete line of
premium quality inputs."

Pl.'s Ex. 1 at 8-9 (citations omitted).

This report relies entirely on the application of the author's economic assumptions and record evidence that itself fails to provide an analysis of interchangeability.  The "indicia" on which the report relies are marketing documents and statements from industry actors.  The report contains not a single number relating to price increases or price stability in other products in response to a rise in the price of any variety of Scotts' CRF.  Id.

Aside from the expert report, USHS relies on internal Scotts documents to establish the existence of a CRF market.  The first of these is a "Regional Sales Analysis" reflecting Scotts' "Market Share."  The document breaks down horticultural products into three categories:  CRF, WSF and SM&A.  Pl.'s Ex. 11.  The next document is entitled "PBG [Professional Business Group] Categories."  The document is a schematic of the categories of

Scotts' products.  Under a branch of the schematic labeled
"Nursery," a sub-branch reads "Controlled Release Fertilizer."
Pl.'s Ex. 4.  A separate document summarizes Scotts' projections
of its market share in the "horticultural input market."  One
chart on this document is titled "Controlled Release Fertilizer"
and states that Scotts holds a 50% share of that market.  Pl.'s
Ex. 3.  Finally, a document from a presentation titled
"Controlled Release Fertilizer" discusses the "brand environment"
and states that Scotts is the "market leader."  Pl.'s Ex. 32.

          Taken in the light most favorable to the plaintiff,
these documents fail to establish that there is a genuine issue
of fact as to the existence of a product market.  These internal
marketing documents contain no discussion of interchangeability
with other products, nor do they attempt an analysis of cross-
price elasticity of demand.  Nor is there any suggestion that
Scotts considered these references to a CRF market to conform to
the antitrust definition of a market.  The repackaging of these
documents as expert opinion does not change the nature of their
content, but serves to highlight the paucity of actual economic
analysis in the expert report itself.

          Finally, USHS' theory of the conspiracy confirms that
the product market that USHS alleges is unreasonably broad.
Following Scotts' non-renewal of USHS' distributorship, Scotts
continued to allow USHS to distribute two varieties of CRF:

Grocote and Ficote.  Pl.'s Exs. 29, 101.  In USHS' opposition to
this motion for summary judgment, the plaintiff "asserts that
. . . [USHS's] sole option for replacing its more than $2.69
million in sales of Scotts CRF would be low-end 'Grocote' private
label sales, and that the termination of the distribution
agreement left [USHS] without access to Scotts' higher-end CRF
products."  Pl.'s Opp'n at 18.  USHS also asserts that "much of
Scotts' CRF sales were for 'mid-tier' CRF formulations that
competed with the CRF manufactured by Polyon, Meister, Multicote,
and Florikan that Griffin specifically agreed not to distribute."
Pl.'s Opp'n at 67.  USHS's argument contradicts itself, casting
CRF as a monolithic market on one page and as comprised of non-
substitutable varieties on another.

        A properly defined market is the foundation of a rule
of reason antitrust case.  See Queen City Pizza, 124 F.3d at 436-
439.  An improperly defined product market will pervert the
assessment of both geographic markets and market power.  Evidence
of reasonable interchangeability, the touchstone of a product
market analysis, requires consideration of price, use, and
qualities. Reasonable interchangeability may also be demonstrated
by cross-elasticity of demand between the product itself and
substitutes for it.  Id. at 437.  USHS presents no evidence
pertinent to cross-price elasticity.  The evidence it offers
regarding reasonable interchangeability makes no reference to

price.  Even had USHS provided relevant evidence, its
hypothetical product market is contradicted by the arguments that
USHS asserts with respect to the plausibility of the alleged
conspiracy.  None of this constitutes evidence of a product
market sufficient to survive summary judgment.

> 2.   USHS Fails to Provide Evidence of Geographic
>      Markets

USHS posits that the market for CRF at the
manufacturing level was the entire United States.  USHS also
argues that transportation costs created "smaller geographic
markets" including a "northern" geographic area for CRF.  Pl.'s
Opp'n at 86.  At the retail level, USHS argues that there exists
a mid-Atlantic and a New England market.  USHS asserts that prior
to its termination by Scotts, it was the dominant distributor in
the mid-Atlantic market and that it was never allowed to enter
into the New England market.  USHS overlays these two market
levels for purposes of this case, arguing that the relevant
markets are the mid-Atlantic and New England markets.  Tr. Oral.
Arg. Nov. 4, 2008, at 29-30.

"The relevant geographic market is the area in which a
potential buyer may rationally look for the goods or services he
or she seeks."  Pa. Dental Ass'n v. Med. Serv. Assn' of Pa., 745
F.2d 248, 260 (3d Cir. 1984).  None of the evidence offered by
USHS demonstrates where buyers look for goods or services.

Although USHS focuses its arguments on the mid-Atlantic and New England markets, the Court will assume that USHS maintains its original claim that the United States is a relevant market at the manufacturing level.  Even with this assumption, the evidence on which the plaintiff bases this claim is insufficient to survive summary judgment.  USHS relies on Scotts' internal documents, as filtered through its expert's report, to establish that the United States is a relevant market.  None of these documents, however, pertains to where buyers (distributors or dealers at the manufacturing level) purchase horticultural products.

USHS' expert makes no statement concerning the United States as a relevant market at the manufacturing level.  The expert's analysis of geographic markets begins by stating that "at the retail level, the markets for CRF, WSF, PPP and growing media are limited by shipping costs, by the location of facilities, sales staff, marketing efforts, and by producers' restrictions on the territories within which their distributors are allowed to sell their products."  Pl.'s Ex. 1 at 9-10.  The report goes on to cite Scotts' internal distribution policies and territorial restrictions in the Scotts-USHS distributor agreements, both of which correspond to USHS' arguments concerning geographic markets at the retail level.  Id. at 10.

Aside from the expert report, USHS also relies on two of Scotts' internal documents, one of which illustrates Scotts' sales across the United States and the other illustrates Scotts' production sites.  Both documents include a map of the United States, but neither purports to analyze consumer behavior.  Pl.'s Exs. 7, 8.  Reliance on Scotts' internal definitions of its "market," ignores the fact that Scotts is not a buyer at the manufacturing level and risks confusing the definition of "market" in an antitrust case with a definition used by sales representatives or one defined, for example, by Scotts' transportation costs alone.  Thus, USHS fails to provide evidence of a market at the manufacturing level sufficient to survive summary judgment.

At the retail level, USHS' evidence is similarly insufficient.  At the retail level, USHS defines the relevant markets as the mid-Atlantic and New England markets.  USHS has asserted that the boundaries of the mid-Atlantic market are defined by the terms of the 1996 Distributor Agreement, which includes a provision outlining "territorial restrictions."   Tr. Oral. Arg. Nov. 4, 2008, at 59:3-6.  The states and counties listed in this contract provision are: North Carolina, Virginia, West Virginia, Pennsylvania, New Jersey, Maryland, Delaware, the District of Columbia, Connecticut, and certain counties in New York.  Pl.'s Ex. 99 at 9.  The 1996 Distributor Agreement does

not describe consumer behavior, and USHS must rely on further evidence to establish that these states comprise a relevant geographic market.

USHS also relies on an article from a publication called Nursery Supplies entitled "Distributors Provide a Critical Link," which describes consumers preferences for regional distributors. Pl.'s Ex. 9. The article does not pertain to any particular product or geographic area, but USHS asserts that it provides a basis for its expert's conclusion that Scotts' distribution policies reflect "the commercial realities of the professional horticultural products industry." Pl.'s Opp'n at 89. Presumably USHS believes that those commercial realities entail a consumer preference for purchasing CRF in either a mid-Atlantic or New England market, but nothing in the document itself suggests as much.

USHS also submits that a letter sent from Griffin to USHS as an overture to Griffin's eventual acquisition of USHS demonstrates the geographic scope of the relevant markets. The letter states that the two companies "are the leaders in the horticulture industry in both the mid-Atlantic and northeast regions." Pl.'s Ex. 128. Not only is this statement divorced from any analysis of consumer behavior, but does not relate to the relevant product market, which must be far narrower than the "horticulture industry."

USHS next points to a document produced by Scotts and created in 1991, which refers to Scotts' concerns with USHS' low pricing of certain soil products.  The document states that these lowered prices "threaten[] Griffin's support of Scotts' large marketshare in New England (CT)."  Pl.'s Ex. 14.  Initially, the Court notes that this document pertains to a different product (Metro-Mix® soil), and is, therefore, of questionable relevance to this case.  As with each piece of evidence offered by USHS on this point, the document makes no reference to consumer preferences or behavior.  USHS presumably offers this document to prove the existence of a New England market.  If that is so, then the reference in this document to Connecticut contradicts USHS' asserted definition of the mid-Atlantic market.  USHS defines the mid-Atlantic market largely by reference to the 1996 Distributor Agreement, which includes Connecticut in its provision on territorial restriction.  Pl.'s Ex. 99 at 9.

USHS next relies on two declarations submitted by industry participants to establish the existence of a mid-Atlantic and New England CRF market.  Each declaration states only that Scotts controlled a certain percentage of the mid-Atlantic or New England "regions."  Pl.'s Ex. 15, ¶¶ 19-20; 16, ¶¶ 12-13.  Again, the evidence does not pertain to the relevant issue: consumer behavior.

The declaration of Dr. Charles J. Elstrodt contains the only attempt by USHS to offer precise boundaries of the New England market.  Elstrodt stated that "[t]he New England region consists of Maine, New Hampshire, Vermont, Massachusetts, Connecticut and Rhode Island."  Pl.'s Ex. 15 at 4 n.1.  Again, the inclusion of Connecticut in the definition of "New England" contradicts USHS' definition of the mid-Atlantic market.

A declaration made by Ronald Soldo, USHS' president, and dated April 4, 2008,[15] states that "[n]urseries and greenhouses have a strong preference for regional distribution as they [want] personal service and a quick response to their professional horticultural needs."  Pl.'s Ex. 83, ¶ 11.  This late-breaking affidavit does not offer an analysis of buyer's preferences in relation to a relevant geographic market.  The fact that buyers prefer regional distribution does not speak to which regions buyers adhere when acquiring horticultural products from distributors.  This declaration does not provide the link between geography and consumer preference that USHS intended it to provide.

---

[15]Like the Press Declaration discussed above, Solodo's declaration was taken after Scotts was obliged to end its discovery and after USHS had an opportunity to confront the holes in its arguments pertaining to geographic markets.  Scotts motion in limine seeks also to strike this declaration from the record. The Court will treat this declaration in the same manner as the Press Declaration.  Because the Court finds that the motion for summary judgment should be granted despite the presence of this untimely declaration, the motion to exclude this declaration is moot.

As noted above, USHS relies on the territorial restrictions contained in Scotts' distributor contract with USHS to define the relevant geographic markets.  Pl.'s Ex. 99 at 9. The contract describes those areas to which Scotts was willing to ship its products, not the geographic areas to which consumers confined their purchases.  In fact, the contract provided that Scotts would be willing to ship its products as far away from the mid-Atlantic as Texas or Louisiana if USHS would build distribution facilities in those states.  The document cannot be interpreted as evidence of consumer preference.

Finally, USHS relies on its expert's report to establish the existence of mid-Atlantic and New England markets at the retail level.  The report relies entirely on the 1996 Distributor Agreement as well as on the documents and statements described above.  Pl.'s Ex. 1 at 9-10.  Filtering those documents and statements through the report of an expert does not render them relevant, nor do they make the report itself relevant evidence.  The expert report never attempts to specify the parameters of either the term "mid-Atlantic" or "New England," and offers no analysis, economic or otherwise, of consumer behavior.  Id.

The evidence offered by USHS to prove the extent of geographic markets fails to speak to the relevant issue of consumer behavior.  Pa. Dental Ass'n, 745 F.2d at 260.  Because

58

the evidence on offer from USHS, taken together and individually, fails to speak to the existence of geographic markets, the Court will grant Scotts' motion for summary judgment.

III. <u>Conclusion</u>

Because USHS has failed to put forth evidence sufficient to survive summary judgment with respect to the elements of conspiracy, product markets and geographic markets, the Court will grant Scotts' motion for summary judgment.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

U.S. HORTICULTURAL SUPPLY,    :    CIVIL ACTION
INC.,                         :
                              :
          v.                  :
                              :
THE SCOTTS COMPANY, et al.    :    NO. 04-5182

ORDER


AND NOW, this 13th day of January, 2009, upon consideration of the defendant The Scotts Company's motion for summary judgment (Docket No. 68), the plaintiff's opposition thereto (Docket No. 78), the defendant's reply (Docket No. 89), the plaintiff's sur-reply (Docket No. 93), the defendant's sur-reply (Docket No. 94), and the arguments presented at oral argument on November 4, 2008, IT IS HEREBY ORDERED that the defendant's motion for summary judgment is GRANTED for the reasons stated in the attached memorandum of January 13, 2009. Judgment is ENTERED for the defendants and against the plaintiff. It is further ORDERED that the defendant The Scotts Company's motion to exclude the opinions and testimony of the plaintiff's expert Richard J. Gering (Docket No. 69), motion to exclude the opinions and testimony of plaintiff's expert John L. Solow

(Docket No. 70), and motion in limine to exclude the post-
discovery affidavits submitted by the plaintiff (Docket No. 71)
are DENIED as moot.

BY THE COURT:


/s/Mary A. McLaughlin
MARY A. McLAUGHLIN, J.